**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JILL BURELLA,** ) | |
| *Individually and as Parent and Natural Guardian* ) | |
| *of Beth Ann Burella, Danielle Burella and* ) | |
| *Nicholas Burella,* ) | |
| ) | **CIVIL ACTION** |
| **Plaintiff**, ) | **No. 00-cv-0884** |
| ) | |
| v. ) | |
| ) | |
| **CITY OF PHILADELPHIA, et al.** ) | |
| ) | |
| **Defendants**. ) | |

---

## MEMORANDUM OPINION AND ORDER

**RUFE, J.**                                                              **September 30, 2009**

Plaintiff Jill Burella[1] brings this action against Defendants City of Philadelphia ("City");

police officers Robert Reamer, Charles Bloom, and Francis Gramlich ("Individual Defendants"); and

police officers John Doe I through IV,[2] alleging violations of the Fourteenth Amendment of the

United States Constitution and state law arising from the January 12, 1999 shooting of Plaintiff by

her deceased husband, George Burella ("Decedent").  Now before the Court is the Motion for

Summary Judgment by the City and Individual Defendants.[3]  For the reasons set forth below, this

---

[1] The Court will refer to Plaintiff Jill Burella as "Plaintiff" when discussing her in her individual capacity, and as "Guardian" when discussing her as the parent and natural guardian of three minor children, Beth Ann, Danielle and Nicholas Burella.

[2] Plaintiff also brought a claim against Warren Zalut, M.D., naming him as a defendant in her Amended Complaint.  (See Document No. 18.)  However, on July 25, 2008, the parties stipulated to the dismissal of Defendant Zalut and all claims against him.  (See Document No. 108.)  Thus, the Court does not address Plaintiff's claims against Defendant Zalut herein.

[3] Mot. for Summ. J. of the Defs., City of Philadelphia, Robert Reamer, Charles Bloom and Francis Gramlich, Pursuant to Fed. R. of Civ. P. 56(b) [Document No. 114] ("Defs.' Mot.").  John Does I through IV did not file a motion for summary judgment.

Motion will be granted in part and denied in part.

## I.   FACTUAL BACKGROUND

This case arises from the events of January 12, 1999, when Decedent shot and seriously injured Plaintiff and then shot and killed himself.  At the time of the shooting, Decedent was a ten-year veteran of the City Police Department, and he and Plaintiff had three young children, an eleven-year-old daughter, Beth Ann, and six-year-old twins, Nicholas and Danielle, on whose behalf Guardian brings claims.

Decedent had emotionally and physically abused Plaintiff for years prior to the shooting.  The abuse began in 1996.  Decedent gambled heavily and compulsively spent money at that time.  Decedent began to physically abuse Plaintiff — pushing her down, throwing her across the room, sitting on top of her and putting guns to her head.  Then, in February of 1996, Decedent was convicted of disorderly conduct for stalking Plaintiff at her workplace and assaulting her male co-worker whom he suspected was having an affair with her.  One month later, in the face of marital troubles and a severe gambling problem, Decedent attempted suicide by overdosing on Tylenol tablets. He survived and was admitted to a psychiatric hospital where he was diagnosed with depression after admitting to fighting with and pushing Plaintiff, as well as having minor gambling problems.

While Decedent was in the hospital, he was visited by Michael Conly, a representative of the City Police Department's Employee Assistance Program ("EAP"), a program designed to assist officers in obtaining help with personal problems.  EAP notified the City Medical Department, which placed Decedent on restricted duty and referred him to City doctors for psychological treatment.  The doctors eventually cleared him to return to full active duty in August 1996, provided

he be evaluated every four months for a period of one year. Decedent was not re-evaluated, although according to the City's Medical Director, if a patient does not keep such a follow-up appointment, "normally personnel . . . would contact the police officer to do so."[4]  There is no indication that Decedent received such a reminder.

Decedent's violence towards his wife continued over the next several years and escalated in 1998. On March 27, 1998, Plaintiff was visiting a friend when Decedent came to the house of her friend dressed in full police uniform, banged on the door and tried to knock it down, all the while shouting and cursing. The Lower Moreland Township Police were called. Decedent insisted that Plaintiff leave with him, so Plaintiff left her friend's home before the Lower Moreland Township Police arrived.

In early June 1998, Plaintiff contacted the City Police Department's Internal Affairs Division to report the abuse. Afterwards, Decedent contacted and reported to EAP on June 15, 1998. He admitted to striking Plaintiff and was referred to a financial counselor, the legal aid committee as well as a support group to help with his pre-existing gambling problem.

Later that month, on June 26, 1998, Decedent assaulted Plaintiff and another man at a local bar. Witnesses called 9-1-1, but Decedent left the bar before police officers arrived. When he got home, he phoned Plaintiff and threatened to shoot their son Nicholas if she did not immediately return to the house. After calling 9-1-1, Plaintiff rushed home, where her husband, who was armed with a gun, threatened to shoot her. Before the matter worsened, City police officers arrived. Decedent initially refused the officers' order to surrender, but did so after the officer in charge agreed

---

[4] Pl.'s Resp. to Mot. for Summ. J. of the Defs., City of Philadelphia, Robert Reamer, Charles Bloom and Francis Gramlich [Document No. 116] ("Pl.'s Resp.") Ex. 29 (Deposition of George T. Hayes, Jr., M.D. ("Hayes Dep.")) at 78:10-13.

to report the incident as a domestic disturbance, rather than a more serious offense.  Defendant Reamer was one of the officers who arrived at the scene.

After the police officers left, Decedent began beating Plaintiff on their front lawn.  Her parents arrived and took her to their house, but Decedent followed them there.  Once at her parents' house, Plaintiff tried to call 9-1-1, but Decedent wrestled the phone from her and told the operator that he was a police officer and that everything was under control.  As a result, the operator did not instruct police to respond to the situation.  Three days later, Plaintiff contacted EAP to report the incident, but EAP failed to notify Internal Affairs and the incident was never investigated.

On July 13, 1998, Decedent called Plaintiff at her place of work in Upper Southampton Township and threatened to kill her.  Upper Southampton police officers were called and arrived in time to witness Plaintiff receiving several more threatening phone calls from her husband.  The officers called Defendant Bloom, Decedent's commanding officer, to inform him of the incident.

Defendant Bloom became directly involved in the situation on August 13, 1998, when Northampton police officers arrested Decedent for assaulting Plaintiff in Bucks County.  The officers released Decedent into the custody of Defendant Bloom, who escorted him home.  Three days later, on August 16, Decedent called Plaintiff while she was visiting his parents with the children and again threatened to kill her. When he went to his parents' house, Northampton police officers responding to an emergency call escorted him to his car, unloaded his firearm and placed it in the trunk of the car.  Shortly thereafter, officers found him driving in the vicinity of the house with his gun re-loaded and placed on the backseat of his car.  Officers took him to a local hospital, but he was released shortly thereafter when his family declined to have him committed for fear that he would lose his job.  After being notified of the incident, Defendant Bloom ordered Decedent to submit to

a psychiatric evaluation.

Later that month, on August 20, 1998, Decedent admitted himself to a psychiatric hospital. He left on August 24, 1998, after four days of treatment, only to return later that day.  He was discharged on August 25, 1998 with a diagnosis of explosive personality disorder and a guarded prognosis.  Several days later, City psychologists examined Decedent and concluded that he should be monitored for the next two years.  After  one follow-up appointment with City doctors in September 1998, Decedent was returned to full active duty but did not return for another evaluation or treatment.

On December 24, 1998, Decedent again assaulted Plaintiff, this time while she was visiting a friend.  When City police officers arrived, they allowed him to leave with the couple's youngest daughter.  They then took Plaintiff and her two other children home, and left.  Decedent then resumed beating her in their home.

Over the course of the next few weeks, Plaintiff obtained three protection from abuse orders ("PFAs") relevant to this lawsuit.  On January 2, 1999, she obtained an emergency ex parte PFA from the Philadelphia Court of Common Pleas that prohibited her husband from "abusing, harassing, stalking and/or threatening" her, and from "living at, entering, attempting to enter or visiting" the couple's home.[5]  The order further provided that officers "shall ... arrest the defendant if he/she fails to comply with this Order."[6]  The next day, Defendant Reamer served the order on Decedent, who, according to Plaintiff, immediately violated it by shouting at and threatening her.  Despite witnessing the alleged violation, Defendant Reamer permitted Decedent to enter the couple's house.  The

_____

[5] Pl.'s Resp. Ex. 30.

[6] Id.

5

Burella children were present during the events of January 3, 1999.

On January 4, 1999, Plaintiff obtained another temporary PFA, which essentially repeated the terms set forth in the January 2 order.[7]  In addition, the court awarded her temporary custody of the couple's three children, prohibited Decedent from having "any contact" with her, and ordered him to relinquish all guns other than his service weapon, which he was required to turn over to his commanding officer at the end of every shift.[8]  The order also stated that "[t]his Order shall be enforced by any law enforcement agency in a county where a violation of this Order occurs."[9]

Later that day, Plaintiff called 9-1-1 after receiving threatening phone calls from Decedent. After officers arrived, and while in their presence, she received several more calls from her husband. The officers told her they could not do anything unless her husband was physically present.  When Plaintiff called the police the next day, again they told her that nothing could be done unless her husband was physically present at her house.  The Burella children were also present during the events of January 4, 1999.

On January 8, 1999, Plaintiff obtained a final PFA.[10]  Four days later, following an appointment with a psychiatrist at the City Medical Department, Decedent went to the house he formerly shared with his wife and shot her in the chest.  He then immediately shot and killed himself. Although she suffered serious injuries, Plaintiff survived the shooting.  The Burella children were not present at the time of the shooting.

---

[7] Pl.'s Resp. Ex. 32.

[8] Id.

[9] Id.

[10] Pl.'s Resp. Ex. 34.

## II.   PROCEDURAL HISTORY

In February 2000, Plaintiff filed a complaint in Pennsylvania state court.[11]  After the case was removed to federal court, she filed an eight-count amended complaint asserting the following claims: Count I, a § 1983 claim against Individual Defendants and John Does for due process violations under the Fourteenth Amendment; Count II, a § 1983 claim against the City for due process violations under the Fourteenth Amendment; Count III, a § 1983 claim against Individual Defendants and John Does for equal protection violations under the Fourteenth Amendment; Count IV, a § 1983 claim against the City for equal protection violations under the Fourteenth Amendment; Count V, a claim against Individual Defendants and John Does for equal protection violations under the Pennsylvania Constitution; Count VI, state tort claims against Individual Defendants and John Does; Count VII a state law claim for intentional and negligent infliction of emotional distress against the Individual Defendants and John Does; and Count VIII, a negligence claim against Defendant Zalut.[12] The City and Individual Defendants moved for summary judgment on all counts asserted against them.[13]  On December 17, 2003, the court granted their motion in part as to Defendant Bloom on Count I and all claims of negligence or negligent infliction of emotional distress in Count VII, but denied it on all other counts.[14]  Individual Defendants filed an interlocutory appeal with the Third Circuit as to the Court's order denying them qualified immunity on Counts I and IV.[15]

---

[11] See Notice of Removal [Document No. 1].

[12] Am. Compl.

[13] See Document Nos. 43 and 74.

[14] Mem. and Order, December 17, 2003 [Document No. 80].

[15] Document No. 83.

On September 13, 2007, the Third Circuit filed an opinion reversing the trial court's denial of qualified immunity.[16]   In doing so, the Third Circuit first determined whether Individual Defendants' conduct violated a constitutional or statutory right.[17]   Considering Plaintiff's § 1983 claims under the Fourteenth Amendment for violations of the Due Process Clause and the Equal Protection Clause, Counts I and IV, respectively, the Third Circuit held that under either clause, Plaintiff failed to establish a constitutional violation.[18]

With respect to Plaintiff's claim under the Due Process Clause, the Third Circuit agreed with the trial court that DeShaney v. Winnebago County Department of Social Services[19] foreclosed Plaintiff from asserting a substantive due process claim.[20]   As to a procedural due process claim, the Third Circuit relied upon Town of Castle Rock v. Gonzalez[21] in holding that the language of the Pennsylvania Protection from Abuse Act ("PPAA") was insufficient "to strip law enforcement of the discretion they have traditionally had in deciding whether to make an arrest."[22]   Moreover, the Third Circuit noted that even if the PPAA did mandate an arrest, it would still not give Plaintiff an entitlement, and hence a property interest, in the same.[23]   Finally, the Third Circuit found that Plaintiff failed to prove a claim under the state-created danger theory because she did not show that

---

[16] Burella v. City of Philadelphia, 501 F.3d 134, 136 (3d Cir. 2007).

[17] Id. at 139; see also Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

[18] Burella, 501 F.3d at 146, 147, 149.

[19] 489 U.S. 189 (1989).

[20] Burella, 501 F.3d at 140.

[21] 545 U.S. 748 (2005).

[22] Burella, 501 F.3d at 145.

[23] Id. at 145-46.

the Individual Defendants affirmatively exercised their authority in a way that rendered her more vulnerable to Decedent's abuse.[24]  Thus, because Plaintiff did not show that Individual Defendants' conduct violated her rights under the Due Process Clause of the Fourteenth Amendment, Individual Defendants were entitled to qualified immunity on Count I.

With respect to Count IV, the Third Circuit held that the Individual Officers were entitled to qualified immunity as well.[25]  The Third Circuit applied the test from <u>Hynson v. City of Chester</u>,[26] pertaining to actions where "a plaintiff alleg[es] an equal protection claim based on the unequal treatment of domestic violence victims."[27]  The Third Circuit, noting that Plaintiff failed to produce any statistical evidence or any individual officer's arrest records, found that "there is a marked absence of any comparable evidence (or even factual allegations) from which a reasonable jury could find an unlawful custom or infer a discriminatory motive."[28]  Hence, the Third Circuit held that Plaintiff had not satisfied the requirements set forth in <u>Hynson</u>.[29]  Nevertheless, the Third Circuit did note that the trial court had not addressed Plaintiff's claim that victims of domestic violence who are spouses of police officers are treated differently than other victims of domestic violence.[30]  It also noted that the trial court had relied on its analysis of Plaintiff's federal equal protection claims to deny summary judgment on the state equal protection claim, and that "the District Court may

---

[24] <u>Id.</u> at 147.

[25] <u>Id.</u> at 148.

[26] 864 F.2d 1026, 1031 (3d Cir. 1988).

[27] <u>Burella</u>, 501 F.3d at 148.

[28] <u>Burella</u>, 501 F.3d at 149.

[29] <u>Id.</u>

[30] <u>Id.</u> at 148 n.18.

determine on remand that it is necessary to reexamine the state claim."[31]   The Third Circuit then remanded this matter for further proceedings consistent with its opinion.[32]

While on appeal, this matter was reassigned to this Court.[33]   Upon remand, the Court ordered the parties to brief their positions as to the effect of the Third Circuit rulings.[34]   As the parties agreed that the Third Circuit opinion mandated that Individual Defendants were entitled to qualified immunity and judgment as a matter of law on Counts I and IV of Plaintiff's and Guardian's claims, the Court will dismiss those claims.[35]   As for the remaining claims, however, the parties dispute whether they are still viable in light of the Third Circuit's decision.   As a result, the Court allowed the City and Individual Defendants to renew their motion for summary judgment on the same.[36]   The Court has carefully reviewed the City and Individual Defendants' Motion for Summary Judgment, the Response, the Reply,[37] the Sur-reply[38] and all accompanying materials, and this matter is now ready for disposition.

## III.   LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact and

---

[31] Id. at 149 n.21.

[32] Id. at 150.

[33] Order, April 17, 2006 [Document No. 96].

[34] Order, June 17, 2008 [Document No. 102] ¶ 3.

[35] Defs.' Mem. of Law Explaining the Effects and Significance of the Third Cir.'s Ruling in Burella v. Philadelphia [Document No. 104] at *7; Pl.'s Mem. of Law Regarding Effects of the Third Cir.'s Ruling in this Matter [Document No. 105] at 4.

[36] Sched. Order, December 2, 2008 [Document No. 113] ¶ 2.

[37] Def.'s Reply Mem. of Law in Support of their Mot. for Summ. J. [Document No. 117] ("Defs.' Reply").

[38] Sur Reply Br. in Support of Pl.'s Resp. to Mot. for Summ. J. of the Defs., City of Philadelphia, Robert Reamer, Charles Bloom and Francis Gramlich [Document No. 121] ("Pl.'s Sur-reply").

. . . the moving party is entitled to judgment as a matter of law."[39]  An issue of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[40]  In examining these motions, all inferences must be drawn in the light most favorable to the nonmovants, and their allegations must be treated as true whenever they conflict with those of the movants and are supported by proper proofs.[41]  The Court will not, however, make any credibility determinations or weigh the evidence presented.[42]

The party moving for summary judgment bears the initial burden of demonstrating that there are no genuine issues of material fact.[43]  Once the movant has done so, the opposing party cannot rest on its pleadings.[44]  To defeat summary judgment, the nonmovant must come forward with probative evidence demonstrating the existence of genuine issues for trial.[45]  The nonmovant therefore must raise "more than a mere existence of a scintilla of evidence in its favor" for elements on which it bears the burden of production.[46]  An inference based upon speculation or conjecture will not create a material fact.[47]

## IV.    PLAINTIFF AND GUARDIAN'S DUE PROCESS CLAIMS AGAINST THE CITY

---

[39] FED. R. CIV. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

[40] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

[41] Kopec v. Tate, 361 F.3d 772, 775 (3d Cir. 2004).

[42] Goodman v. Pa. Tpk. Comm'n, 293 F.3d 655, 665 (3d Cir. 2002) (quoting Reeves v. Sanderson Plumbing Prods., 560 U.S. 133, 150 (2000)).

[43] FED. R. CIV. P. 56(c).

[44] Celotex, 477 U.S. at 324.

[45] Id. at 323-24.

[46] Anderson, 477 U.S. at 252.

[47] Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990).

In Count II, Plaintiff and Guardian allege that the City violated the rights of Plaintiff and the Burella children under the Due Process Clause of the Fourteenth Amendment. To prevail on each claim brought under 42 U.S.C. § 1983, Plaintiff and Guardian must first demonstrate that a state actor deprived them of a federally protected right.[48] They assert two theories under which the Court could find a violation of their due process rights, specifically state-created danger and procedural due process. The Court will examine each in turn.

### A.        State-Created Danger

The state-created danger theory under the Fourteenth Amendment applies when "discrete, grossly reckless acts committed by the state or state actors, leav[es] a discrete plaintiff vulnerable to foreseeable injury."[49] To succeed in this claim, Plaintiff and Guardian must establish that (1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.[50] The Third Circuit has "characterized the issue raised under the fourth element of a state-created danger claim as whether 'the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.'"[51] Plaintiff and Guardian cannot succeed on their state-

---

[48] <u>Wilson v. Russo</u>, 212 F.3d 781, 786 (3d Cir. 2000).

[49] <u>Kneipp v. Tedder</u>, 95 F.3d 1199, 1208 (3d Cir. 1996) (<u>quoting</u> <u>Mark v. Borough of Hatboro</u>, 51 F.3d 1137, 1153 (3d Cir. 1995)).

[50] <u>Bright v. Westmoreland County</u>, 443 F.3d 276, 281 (3d Cir. 2006) (citations and quotation marks omitted).

[51] <u>Id.</u> at 283 (internal citations and quotation marks omitted).

created danger claims because there is no evidence that the City affirmatively exercised its authority in a way that rendered Plaintiff or the Burella children more vulnerable to harm.[52]

Although Plaintiff and Guardian attempt to construe the City's actions as affirmative exercises of authority, what they actually complain of is the City's failure to act. For example, Plaintiff and Guardian argue that the City affirmatively used its authority to establish the EAP program.[53] Yet, they do not contend that the establishment of the EAP program in and of itself made Plaintiff or the Burella children more vulnerable to harm. Instead, they claim that Plaintiff and the Burella children were made more vulnerable to harm by the City's failure to discipline Decedent as well as its failure to procure appropriate treatment for him, both of which were made possible through the EAP program. Plaintiff and Guardian are not asserting that Plaintiff or the Burella children were rendered more vulnerable by the City referring Decedent for treatment through the EAP program, but rather that this referral resulted in the City failing to investigate incidents of abuse and to procure proper care for Decedent. They are not arguing that they were more vulnerable because Decedent was returned to full active duty, but rather that afterwards, the City failed to monitor Decedent to ensure his compliance with the necessary treatment and medication.

Here, "what is alleged to have created a danger was the failure of the defendant[] to utilize [its] state authority, not [its] utilization of it."[54] Plaintiff and Guardian have identified no action of the City's in which it exercised its authority to make Plaintiff or the Burella children more vulnerable to harm. As a failure to act "does not give rise to a cognizable state-created danger claim," their

---

[52] Plaintiff and Guardian's claim against Individual Defendants under the state-created danger theory also fail because they could not prove affirmative action on the part of the officers. Burella, 501 F.3d at 146.

[53] Pl.'s Resp. at 31.

[54] Bright, 443 F.3d at 284.

13

state-created danger claim against the City must fail.[55]

### B.     Procedural Due Process

Plaintiff and Guardian argue that in spite of the Third Circuit's decision in this matter, they still have a viable procedural due process claim against the City.[56]  The Fourteenth Amendment prohibits "state deprivations of life, liberty, or property without due process of law."[57]  To establish a procedural due process claim, a plaintiff must first establish that "the asserted individual interests are encompassed within the fourteenth amendment's protection of 'life, liberty, or property.'"[58]

In Burella, the Third Circuit held that Plaintiff did not state a procedural due process claim because she was not entitled to police enforcement of her PFAs, and therefore did not have a property interest in the same.[59]  Key to this holding was the Third Circuit's conclusion that police officers still had discretion on whether to arrest PFA violators under the PPAA.[60]  Plaintiff and Guardian argue that unlike the Individual Defendants, the City is bound by the admission of its corporate designee that the City's policy requires officers to arrest PFA violators, allowing them no discretion.[61]  Yet, such a statement cannot bind the City, as it is a conclusion of law rather than a

---

[55] Burella, 501 F.3d at 147-48.

[56] Pl.'s Resp. at 49-51.

[57] Robb v. City of Philadelphia, 733 F.2d 286, 292 (3d Cir. 1984)

[58] Board of Regents v. Roth, 408 U.S. 564, 569-72 (1972); Morrissey v. Brewer, 408 U.S. 471, 481 (1972).

[59] Burella, 501 F.3d at 145.

[60] Id.

[61] Pl.'s Resp. at 50.

14

factual admission.[62]   Moreover, the Third Circuit held that as a matter of law, police officers have discretion under the PPAA.[63]   This Court is bound to apply the law as interpreted by the Third Circuit, not the parties.   It is axiomatic that on remand, a "trial court must implement both the letter and spirit of the [appellate court] mandate, taking into account the appellate court's opinion and the circumstances it embraces."[64]   Thus, the admission of the City's corporate designee can neither trump the Third Circuit's holding nor bind this Court to a certain interpretation of the law. Furthermore, even if the PPAA did mandate the arrest of PFA violators, it does not give Plaintiff an entitlement to the same.[65]   Hence, Plaintiff and Guardian cannot demonstrate a property interest upon which to base a procedural due process claim.

Under either the state-created danger or procedural due process theory, Plaintiff and Guardian have not established a due process violation.   Thus, as there is no constitutional violation, Plaintiff and Guardian's § 1983 claim under the Due Process Clause of the Fourteenth Amendment must fail, and the Court will dismiss the same.

## V.    PLAINTIFF AND GUARDIAN'S EQUAL PROTECTION CLAIMS

In Count III, Plaintiff and Guardian allege that the City violated their rights under the Equal Protection Clause of the Fourteenth Amendment.   The Equal Protection Clause of the Fourteenth Amendment "commands that no state shall deny to any person within its jurisdiction the equal

---

[62] See AstenJohnson, Inc. v. Columbia Cas. Co., 562 F.3d 213, 229 n.9 (3d Cir. 2009) (noting that a party was not bound by the legal conclusions of its Rule 30(b)(6) witness).

[63] Burella, 501 F.3d at 145.

[64] Casey v. Planned Parenthood of Southeastern Pennsylvania, 14 F.3d 848, 856 (3d Cir. 1994) (internal citations omitted).

[65] Burella, 501 F.3d at 145-46.

protection of the laws."[66]  The Equal Protection Clause "keeps governmental decisionmakers from treating differently people who are in all relevant respects alike."[67]  Here, Plaintiff and Guardian claim that they still have an equal protection claim against the City based upon Plaintiff's status as (1) a victim of domestic violence; (2) a victim of violators of PFAs; (3) a spouse of a police officer; and (4) a woman in general.[68]

### A.      Guardian's Equal Protection Claims on Behalf of the Burella Children

As an initial matter, the Court recognizes the general rule that "one cannot sue for the deprivation of another's civil rights."[69]  Guardian has produced no evidence nor even argued that the Burella children themselves were denied equal protection.  Guardian cannot pursue claims against the City on behalf of the Burella children based upon the City denying Plaintiff equal protection.  While it is conceivable that the Burella children were treated differently from other children because of their mother's status as a victim of domestic violence, the spouse of a police officer or the victim of a violator of PFAs, there is still no evidence to this effect.  Thus, the City is entitled to summary judgment on Guardian's § 1983 claims under the Equal Protection Clause of the Fourteenth Amendment.

### B.      Plaintiff's Equal Protection Claim Based Upon Gender

With respect to Plaintiff's claim premised upon her status as a woman in general, Hynson held that a claim for gender-based discrimination in the context of police officers differentiating

---

[66] Nordlinger v. Hahn, 505 U.S. 1, 10 (1992) (internal citation and quotation marks omitted).

[67] Id.

[68] Pl.'s Resp. at 38.

[69] O'Malley v. Brierley, 477 F.2d 785, 789 (3d Cir. 1973) (internal citations and quotation marks omitted).

between domestic and nondomestic violence will not be raised unless there is " a showing of an intent, purpose or effect of discriminating against women."[70]   A plaintiff can achieve this by proffering "sufficient evidence that would allow a reasonable jury to infer that it is the policy or custom of the police to provide less protection to victims of domestic violence than to other victims of violence, that discrimination against women was a motivating factor, and that the plaintiff was injured by the policy or custom."[71]   The Third Circuit held that Plaintiff did not satisfy this standard.[72]   Although this holding was in the context of Individual Defendants' qualified immunity, Plaintiff nonetheless continues to present evidence only pertaining to the City's handling of her case without any pertinent statistical evidence, or the arrest records of certain officers involved.[73]   There is still "a marked absence of any comparable evidence (or even factual allegations) from which a reasonable jury could find an unlawful custom or infer a discriminatory motive."[74]   Hence, any claim based upon Plaintiff's status as a woman in general must fail, and the City is entitled to summary judgment on the same.

### C.   Plaintiff's Equal Protection Claim Based Upon Other Classifications

The remaining classifications that Plaintiff asserts as bases for her equal protection claims do not invoke the suspect classification of gender.   Thus, they need not satisfy the Hynson test.

---

[70] Hynson, 864 F.2d at 1031.

[71] Id.

[72] Burella, 501 F.3d at 149.

[73] Id.; see also Watson v. Kansas City, 857 F.2d 690, 696 (10th Cir. 1988) (plaintiff adduced statistical evidence that nondomestic violence complaints were more likely to lead to arrest than domestic violence complaints, as well as evidence that officers received training instructing them to arrest an abuser as a last resort); see also Brown v. Grabowski, 922 F.2d 1097, 1117 n.12 (3d Cir. 1990) (plaintiff produced evidence of the arrest records of individual officers).

[74] Burella, 501 F.3d at 149.

Instead, Plaintiff need simply show that she "'receiv[ed] different treatment from that received by other individuals similarly situated.'"[75] As a result, the equal protection analysis begins by "identifying similarly situated persons."[76] "Persons are similarly situated under the Equal Protection Clause when they are alike 'in all relevant aspects.'"[77] Plaintiff does not specify what persons were similarly situated to her but treated differently. However, it may be assumed that Plaintiff would claim victims of domestic violence are similarly situated to victims of nondomestic violence,[78] or that a spouse of a police officer is similarly situated to those who are not married to police officers.

Nonetheless, the Court cannot ascertain which persons would be similarly situated to victims of violators of PFAs. It is not clear that this asserted status of Plaintiff's is in any way distinguishable from her status as a victim of domestic violence. Plaintiff may be contending that victims of violators of PFAs are similarly situated to but treated differently from victims of violators of other types of protective orders, such as restraining orders, but no evidence has been presented nor any argument made to this effect. Hence, there is no genuine issue of material fact that would preclude granting the City summary judgment on this claim, and any claim based upon Plaintiff's status as a victim of a violator of a PFA must fail.

Plaintiff also does not specify how she was treated differently from similarly situated persons, but the Court will assume, based upon her adherence to the <u>Hynson</u> test, that Plaintiff is arguing that as a victim of domestic violence, she received less protection than other victims of violence. Yet,

---

[75] <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1478 (3d Cir. 1990) (quoting <u>Kuhar v. Greensburg-Salem Sch. Dist.</u>, 616 F.2d 676, 677 n.1 (3d Cir. 1980)) (alteration in original).

[76] <u>United States v. Pollard</u>, 326 F.3d 397, 406 (3d Cir. 2003).

[77] <u>Startzell v. City of Philadelphia</u>, 533 F.3d 183, 203 (3d Cir. 2008).

[78] <u>See Hynson</u>, 864 F.2d at 1030.

18

the evidence Plaintiff cites in support of this claim primarily relates to police officers' failure to protect her, to enforce her PFAs and to arrest Decedent. It does not demonstrate that other victims of violence would have been treated any differently. For example, Plaintiff highlights the events of December 24, 1998 and that the City officers left without ensuring Plaintiff's safety or arresting Decedent.[79] Yet, Plaintiff presents no evidence that other similarly situated persons would have been treated differently. There is no evidence as to the standard procedure in responding to such a call, whether standard procedure was followed, or whether standard procedure differs if the call is related to a domestic disturbance as opposed to another type of disturbance. In sum, there is no evidence from which a reasonable juror could find that if Plaintiff was a victim of another type of violence rather than domestic, or if Decedent was not a police officer, the incidents cited by Plaintiff would have been investigated or that the officers on hand would have acted differently than they did. This same flaw is present in most of Plaintiff's other proffers, including the police response to Decedent violating Plaintiff's PFA with threatening phone calls, the referral of Decedent to EAP and EAP's response to Plaintiff's complaints.

The only exception is the June 26, 1998 incident when Decedent barricaded himself in the house. Defendant Reamer testified in his deposition that the normal procedure would have been to enter the house to determine if there were any weapons and to ensure the safety of the occupants.[80] This did not occur after the commanding officer spoke with Decedent and assessed the situation as under control.[81] Moreover, when Plaintiff called 9-1-1 in the aftermath of the June 26 incident to

---

[79] Pl.'s Resp. at 42.

[80] Pl.'s Resp. Ex. 18 (Dep. of Officer Robert H. Reamer, May 23, 2001 ("Reamer Dep.")) at 47:13-51:13.

[81] Id. at 19:13-20:11.

report that Decedent was assaulting her again, Decedent took the receiver and told the operator that he was an officer and that the situation was under control.[82]  There was no investigation and no police officer was dispatched to the scene.[83]  Yet, even if a reasonable juror could find that in this instance Plaintiff was treated differently from similarly situated persons, there is still no evidence of a policy or custom on the part of the City.

As a municipality, the City will only be liable under § 1983 if the constitutional violation at issue was in fact caused by the implementation or execution of a municipal's "policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers."[84] There are three situations where acts of a government employee may be deemed to be the result of a policy or custom of the government entity for whom the employee works, thereby rendering the entity liable under § 1983: (1) where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy; (2) where a policy or custom exists and the policymaker has failed to act affirmatively at all, although the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need; and (3) where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself.[85]

---

[82] Pl.'s Resp. Ex. 4 (Dep. of Jill Burella, June 4, 2001 ("Pl.'s Dep.")) at 553:16-555:13.

[83] Id. at 555:14-15, 556:8-10.

[84] Monell v. Dept. of Social Servs., 436 U.S. 658, 690 (1978).

[85] Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 250 (3d Cir. 2007).

Plaintiff does not argue that there was a generally applicable statement of policy that denied her equal protection of the law or that any City employee involved in the events at issue were policymakers. Moreover, there is total lack of evidence in the record showing that it is a City custom or policy to treat spouses of police officers differently from those who are not. Plaintiff does, however, adduce evidence of confusion among police officers as to when they could make an arrest in a domestic violation situation. Still, it is a leap of logic to assume that this means that victims of domestic violence were ultimately treated differently from victims of nondomestic violence. For example, Plaintiff states that the confusion among officers resulted in officers not making arrests for violations of PFAs when they could.[86] Yet, she produces no evidence that when handling an incident of nondomestic violence, it was the policy or custom among officers to always make an arrest if they could. Hence, there is no evidence that this confusion among police officers resulted in denying victims of domestic violence equal protection of the law. Furthermore, the Third Circuit found this evidence insufficient to prove a policy or custom of police providing less protection to victims of domestic violence than to other victims of violence, albeit in the context of qualified immunity.[87] Hence, Plaintiff has not produced sufficient evidence of a custom or policy on the part of the City, and for that reason, the City is entitled to summary judgment on her remaining equal protection claims.[88]

---

[86] Pl.'s Resp. at 26.

[87] Burella, 501 F.3d at 148-49.

[88] Plaintiff also brings claims against the City for failure to train and adequately supervise its employees regarding PFAs and domestic violence situations. Such claims, however, require Plaintiff to demonstrate that the City had a policy or custom that "actually caused a constitutional injury." Fagan v. City of Vineland, 22 F.3d 1283, 1291 (3d Cir. 1994); see Carter v. City of Philadelphia, 181 F.3d 339, 356-57 (3d Cir. 1999) (applying the same standard to claims involving a failure to either train or supervise municipal employees). As Plaintiff cannot demonstrate that she suffered a constitutional injury, these claims must fail.

### D.   Plaintiff and Guardian's State Equal Protection Claims

In Count V, Plaintiff and Guardian bring claims for violations of Pennsylvania equal protection law pursuant to the Pennsylvania Constitution.[89]  It is clearly established that the "equal protection provisions of the Pennsylvania Constitution are analyzed . . . under the same standards used by the Supreme Court when reviewing equal protection claims under the Fourteenth Amendment to the United States Constitution."[90]  As the Court will dismiss Plaintiff and Guardian's federal equal protection claims, so too will it dismiss their state equal protection claims.

## VI.   PLAINTIFF AND GUARDIAN'S STATE TORT CLAIMS

Counts VI and VII allege state law claims against Individual Defendants.  Count VI alleges that Individual Defendants (1) "possessed the statutory authority to regulate the aforementioned hazardous situations,"[91] (2) "had knowledge of the aforementioned hazardous situations and the ability to rectify the situations,"[92] and (3) "otherwise violated Plaintiff's civil rights pursuant to the Pennsylvania Constitution and common law."[93]  Yet, Count VI does not identify under what law or theory Plaintiff and Guardian seek relief.  Count VII is a claim against Individual Defendants for intentional infliction of emotional distress.[94]

Plaintiff and Guardian maintain that summary judgment has already been denied on these

---

[89] Am. Compl. ¶¶ 113-17.

[90] Love v. Borough of Stroudsburg, 597 A.2d 1137, 1139 (Pa. 1991).

[91] Am. Compl. ¶ 119.

[92] Id. ¶ 120.

[93] Id. ¶ 121.

[94] Id. ¶¶ 123-25.  The prior ruling dismissed all claims for negligence or negligent infliction of emotion distress from Count VII.

claims.  Hence, they contend that the Court is barred from revisiting that previous ruling by the law of the case doctrine.  Plaintiff and Guardian are correct that when "a court of appeals reverses a judgment and remands for further consideration of a particular issue, leaving other determinations of the trial court intact, the unreversed determinations of the trial court normally continue to work an estoppel."[95]  Such an estoppel, however, "requires of a previous determination that (1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action."[96]

In its prior ruling on summary judgment, the trial court held that "Count V and VI assert claims against the individual officer defendants for violations of Pennsylvania equal protection law."[97]  Relying on its denial of summary judgment on the federal equal protection claims, the trial court denied summary judgment on Count VI as well.[98]  If, as Plaintiff and Guardian urge, this construction should stand, then in light of the Third Circuit decision, this Court would dismiss Count VI just as it did Count V.  In comparison, Individual Defendants claim that the trial court's prior ruling mis-characterized Count VI, and therefore there was never actually a ruling on Count VI.  In that case, as the issue was not previously adjudicated, this Court would be free to consider the matter.

Individual Defendants claim that they are entitled to immunity on the claims in Count VI.

---

[95] Cowgill v. Raymark Indus., Inc., 832 F.2d 798, 802 (3d Cir. 1987).

[96] United States v. 5 Unlabeled Boxes, 572 F.3d 169, 173 (3d Cir. 2009) (internal citations and quotation marks omitted).

[97] Mem. and Order, December 17, 2003 at 30.

[98] Id. at 30-31.

Under Pennsylvania law, government units are generally immune from suit under state law.[99] Employees of those government units, acting within the scope of their duties, share that same immunity.[100]   However, there is an exception for "willful misconduct."[101]   Hence, Individual Defendants are immune from this claim unless Plaintiff and Guardian can show willful misconduct. Plaintiff and Guardian, however, have failed to even identify what actions of Individual Defendants underlie this claim.  As a result, they cannot demonstrate that Individual Defendants engaged in willful misconduct.  Summary judgment is appropriate when the non-moving party fails to rebut by making a factual showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[102]  Thus, whether or not this Court accepts the trial court's prior construction of Count VI, Individual Defendants remain entitled to summary judgment on the same.

As for Count VII, the law of the case doctrine does work an estoppel on this Court from revisiting the trial court's prior ruling as it applies to Plaintiff.  In any event, Plaintiff has adduced sufficient evidence to create a genuine issue of material fact as to whether Individual Defendants' action were willful misconduct.  In King v. Breach, the Pennsylvania Commonwealth Court found

---

[99] 42 Pa. Cons. Stat. Ann. § 8541 (2007) ("Except as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person"); see also id. § 8501 (defining "local agency" as a "government unit other than the Commonwealth government").

[100] Id. § 8545 ("An employee of a local agency is liable for civil damages on account of any injury to a person or property caused by acts of the employee which are within the scope of his office or duties only to the same extent as his employing local agency and subject to the limitations imposed by this subchapter.").

[101] Id. § 8550 ("In any action against a local agency or employee thereof for damages on account of an injury caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted . . . willful misconduct, [immunity] shall not apply.").

[102] Celotex, 477 U.S. at 322.

the term "willful misconduct" to be "synonymous with the term 'intentional tort.'"[103]  The court defined willful misconduct as when "the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so such desire can be implied."[104]  The Pennsylvania Supreme Court in Renk v. City of Pittsburgh, however, held that King's equation of willful misconduct with intentional tort "has no validity in the context of a lawsuit based upon police conduct."[105]  Interpreting Renk, the Third Circuit has required "a showing of an intention to do what is known to be wrong."[106]  According to the Pennsylvania Supreme Court, "one who by extreme or outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."[107]  Plaintiff has adduced sufficient evidence from which a reasonable juror could find that the Individual Defendants intentionally engaged in extreme or outrageous conduct with the intention that she be caused severe emotional distress.  Accordingly, the Court will deny Individual Defendants summary judgment on Plaintiff's claim for intentional infliction of emotional distress.

With regard to Guardian's claim for intentional infliction of emotional distress, however, there was no prior ruling specifically granting or denying Individual Defendants summary judgment

---

[103] 540 A.2d 976, 981 (Pa. Commw. Ct. 1988).

[104] Id.

[105] 641 A.2d 289, 293 (Pa. 1994).

[106] In re City of Philadelphia Litig., 158 F.3d 723, 728 (3d Cir. 1998); see also Sameric Corp. of Del. v. City of Philadelphia, 142 F.3d 582, 600-01 (3d Cir. 1998) (requiring defendant members of the Philadelphia Historical Commission "actually knew that their conduct was illegal"); cf. Bright, 443 F.3d at 287 (citing the language of King when analyzing the immunity of a police officer who failed to arrest a parolee before the parolee murdered plaintiff's daughter); Brown, 269 F.3d at 214 (citing the language of King when analyzing the immunity of a police officer who shot plaintiffs' dog).

[107] Hoy v. Angelone, 720 A.2d 745, 753 (Pa. 1998).

on this claim.  For issues left unresolved by the trial court, it is well established that "upon remand, [the trial court] may consider, as a matter of first impression, those issues not expressly or implicitly disposed of by the appellate decision."[108]  Even so, Guardian has still produced no evidence nor even argued that the Burella children suffered extreme emotional distress as a result of Individual Defendant's actions.  As Guardian has adduced insufficient evidence for a reasonable juror to find for her on this claim, the Court will grant Individual Defendants summary judgment on the same.

## V.   CONCLUSION

In light of the Third Circuit decision in this matter, Individual Defendants are entitled to summary judgment on Counts I and IV of Plaintiff and Guardian's claims.  Moreover, Plaintiff and Guardian  cannot show that the City had a policy or custom that violated their constitutional rights under either the Due Process Clause or the Equal Protection Clause of the Fourteenth Amendment. Thus, the City and Individual Defendants are entitled to summary judgment on Counts II, III and V. Individual Defendants are entitled to summary judgment on Count VI, Plaintiff and Guardian's state tort law claim.  Individual Defendants are also entitled to summary judgment on Guardian's claim for intentional infliction of emotional distress under Count VII.  Individual Defendants are not, however, entitled to summary judgment on Plaintiff's claim for intentional emotional distress under Count VII.[109]

An appropriate Order follows.

---

[108] Pardini v. Allegheny Intermediate Unit, 524 F.3d 419, 423 (3d Cir. 2008) (citing Bankers Trust Co. v. Bethlehem Steel Corp., 761 F.2d 943, 949 (3d Cir.1985)).

[109] The Court notes that it has dismissed all of the federal claims in this matter over which it had original jurisdiction.  Nevertheless, given the long and involved history of this action, the Court will continue to exercise supplemental jurisdiction over Plaintiff's state law claim for intentional infliction of emotional distress.  See 28 U.S.C. § 1367(c)(3).